IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| KEKAI WATANABE,<br>#94102-022,<br><br>                    Plaintiff,<br><br>        v.<br><br>ESTELA DERR, et al.,<br><br>                    Defendants. | Civil No. 22-00168 JAO-RT<br><br>ORDER DISMISSING FIRST<br>AMENDED COMPLAINT IN PART<br>AND DIRECTING SERVICE |

## ORDER DISMISSING FIRST AMENDED COMPLAINT IN PART AND DIRECTING SERVICE

Before the Court is a First Amended Prisoner Civil Rights Complaint

("FAC"), ECF No. 8, filed by pro se Plaintiff Kekai Watanabe ("Watanabe" or

"Plaintiff") pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of

Narcotics*, 403 U.S. 388 (1971).[1]  Watanabe alleges that four officials[2] at FDC

---

[1]  On May 19, 2021, Watanabe pleaded guilty to being a felon in possession of
ammunition in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2).  *See United
States v. Watanabe*, Cr. No. 21-00066 HG (D. Haw.), ECF Nos. 25, 29.  Watanabe
is currently scheduled to be sentenced on October 6, 2022.  *See id.*, ECF No. 36.
Watanabe is presently in custody at the Federal Detention Center in Honolulu,
Hawaiʻi ("FDC Honolulu").  *See* Federal Bureau of Prisons,
https://www.bop.gov/inmateloc/ (select "Find By Number"; enter "94102-022" in
"Number" field; and select "Search") (last visited August 2, 2022).

[2]  Watanabe names as Defendants Warden Estela Derr ("Warden Derr"), Unit

(continued . . .)

Honolulu violated the Eighth Amendment by threatening his safety and denying him adequate medical care. ECF No. 8 at 6–9. After screening the FAC pursuant to 28 U.S.C. §§ 1915(e)(2) and 1915A(b), the Court again concludes that Watanabe states a plausible denial of adequate medical care claim against Nurse Nielsen in his individual capacity. That claim shall be served and requires a response. Watanabe's remaining claims are DISMISSED without prejudice.

## I.   STATUTORY SCREENING

The Court is required to screen all in forma pauperis prisoner pleadings against government officials pursuant to 28 U.S.C. §§ 1915(e)(2) and 1915A(a). *See Byrd v. Phx. Police Dep't*, 885 F.3d 639, 641 (9th Cir. 2018). Claims or complaints that are frivolous, malicious, fail to state a claim for relief, or seek damages from defendants who are immune from suit must be dismissed. *See Lopez v. Smith*, 203 F.3d 1122, 1126–27 (9th Cir. 2000) (en banc); *Rhodes v. Robinson*, 621 F.3d 1002, 1004 (9th Cir. 2010).

Screening under 28 U.S.C. §§ 1915(e)(2) and 1915A(a) involves the same standard of review as that used under Federal Rule of Civil Procedure 12(b)(6). *See Rosati v. Igbinoso*, 791 F.3d 1037, 1039 (9th Cir. 2015) (per curiam). Under

---

(. . . continued)
Manager K. Robl ("Robl"), Staff Nurse Francis Nielsen ("Nielsen"), and Chief Doctor Nathan Kwon ("Dr. Kwon") in their individual capacities. ECF No. 8 at 1–3.

this standard, a complaint must "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks and citation omitted). A claim is "plausible" when the facts alleged support a reasonable inference that the plaintiff is entitled to relief from a specific defendant for specific misconduct. *See id.*

In conducting this screening, the Court liberally construes pro se litigants' pleadings and resolves all doubts in their favor. *See Hebbe v. Pliler*, 627 F.3d 338, 342 (9th Cir. 2010) (citations omitted). The Court must grant leave to amend if it appears the plaintiff can correct the defects in the complaint. *See Lopez*, 203 F.3d at 1130. When a claim cannot be saved by amendment, dismissal with prejudice is appropriate. *See Sylvia Landfield Tr. v. City of Los Angeles*, 729 F.3d 1189, 1196 (9th Cir. 2013).

## II.   **BACKGROUND**[3]

In 2021, Watanabe was housed in "unit 5A" at FDC Honolulu with members of various gangs including "Uso," "Murder Inc," "La Familia," "Paisa's," "Tango's," "MS-13," "Northeno," and "Soreno's." ECF No. 8 at 6–7. Unit 5A's inmate population also included "deportable aliens, pre-sentence inmates, pre-trial inmates, high security inmates through minimum security inmates[,] and inmates

---

[3] At screening, Watanabe's well-pleaded factual allegations are accepted as true. *See, e.g.*, *Nordstrom v. Ryan*, 762 F.3d 903, 908 (9th Cir. 2014).

that have pending orders for civil commitment due to psychiatric issues." *Id.* at 6. Watanabe has a "history of gang (Uso) affiliation," and Robl and other "staff at FDC Honolulu" were aware of this affiliation. *Id.*

On July 12, 2021, Watanabe was sitting at a table in unit 5A when four members of the Paisa's gang attacked him. *Id.* at 7. The disturbance eventually included more than 35 "combatants." *Id.* Watanabe was "severely beaten" during the disturbance by the four gang members who initially attacked him and also "other Latino gang members." *Id.* At one point, Watanabe was beaten by someone wielding a "lock in a sock." *Id.*

After order was restored in unit 5A, approximately 20 inmates including Watanabe were moved to the special housing unit ("SHU"). *Id.* Watanabe's injuries were "documented," and he was told "that he would be put on 'Sick Call.'" *Id.* At 8 p.m. on the day of the disturbance, Watanabe asked correctional officers Noni and Woodson (who are not named as defendants) to be seen by medical staff because he was experiencing "severe pain and headaches." *Id.* Watanabe described his symptoms to Nurse Nielsen, and Nielsen responded by telling Watanabe "'to stop being a cry baby.'" *Id.* Nielsen denied Watanabe's request to be taken to the hospital. *Id.*

Watanabe remained in the SHU for more than two months. *Id.* During this time, Watanabe "submitted multiple sick call and 'COP OUT' requests for medical

4

attention." *Id.* According to Watanabe, he was given "over the counter pain medication" but "no actual treatment." *Id.* Watanabe was later diagnosed with a "fractured [coccyx] with bone chips in soft tissue around his tailbone." *Id.* These injuries caused Watanabe "severe pain." *Id.* Upon his release from the SHU, Watanabe returned to unit 5A along with the other inmates involved in the July 12, 2021 disturbance. *Id.*

Watanabe alleges Dr. Kwon had an "opportunity to properly diagnose [his] injuries" between July 2021 and January 2022, but he failed to do so. *Id.* at 9. During this period, "Health Services ignored multiple request[s] for treatment." *Id.* When Health Services identified Watanabe's fractured coccyx in February 2022, it agreed to send Watanabe to a specialist. *Id.* According to Watanabe, he had submitted to Dr. Kwon "11 emails and COP OUTS" seeking medical attention. *Id.* at 8.

Watanabe commenced this action by signing the original Complaint on March 31, 2022. ECF No. 1 at 10. In the original Complaint, Watanabe alleged that Warden Derr, Robl, Nielsen, and Dr. Kwon violated the Eighth Amendment by threatening his safety and denying him adequate medical care. *Id.* at 6–8.

On May 19, 2022, the Court issued an Order Dismissing Complaint in Part with Partial Leave Granted to Amend. ECF No. 5. The Court concluded, in relevant part, that Watanabe failed to allege a plausible failure to protect claim

based on events either before or after the July 12, 2021 disturbance. *Id*. at 11–16.

The Court further concluded that Watanabe stated a plausible denial of medical care claim against Nielsen but no other Defendant. *Id*. at 16–18.  The Court gave Watanabe the choice of proceeding with his claim against Nielsen or filing an amended pleading that cured the deficiencies in his other claims. *Id*. at 20–21.

The Court received the FAC on July 7, 2022.  ECF No. 8.  In the FAC, Watanabe maintains that Warden Derr, Robl, Nielsen, and Dr. Kwon violated the Eighth Amendment by threatening his safety and denying him adequate medical care. *Id*. at 6–9.  Watanabe seeks "$3,000,000 for pain and suffering at the hands of the Defendants." *Id.* at 11.

## III.   DISCUSSION

### A.   Legal Framework For *Bivens* Claims

In *Bivens*, the Supreme Court "recognized for the first time an implied right of action for damages against federal officers alleged to have violated a citizen's constitutional rights." *Hernandez v. Mesa*, 582 U.S. ___, 137 S. Ct. 2003, 2006 (2017) (per curiam) (internal quotation marks and citation omitted).  *Bivens* involved a suit against individual federal agents who violated the Fourth Amendment's prohibition against unreasonable searches and seizures. *See Bivens*, 403 U.S. at 389–90.  Since *Bivens*, the Supreme Court has expanded this implied cause of action only twice. *See Ziglar v. Abbasi*, 582 U.S. ___, 137 S. Ct. 1843,

1855 (2017) ("These three cases — *Bivens*, *Davis*, and *Carlson* — represent the only instances in which the Court has approved of an implied damages remedy under the Constitution itself."); *Davis v. Passman*, 442 U.S. 228 (1979) (suit under the Fifth Amendment's Due Process Clause for gender discrimination by a United States Congressman); *Carlson v. Green*, 446 U.S. 14 (1980) (suit under the Eighth Amendment's Cruel and Unusual Punishment Clause for failure to provide adequate medical treatment by federal prison officials).

The Supreme Court "has made clear that expanding the *Bivens* remedy is now a 'disfavored' judicial activity." *Abbasi*, 582 U.S. at ___, 137 S. Ct. at 1857 (quoting *Iqbal*, 556 U.S. at 675). "This is in accord with the Court's observation that it has 'consistently refused to extend *Bivens* to any new context or new category of defendants.'"[4] *Id.* (quoting *Malesko*, 534 U.S. at 68). Indeed, the

---

[4] The Supreme Court declined to create a *Bivens* remedy in the following cases: a First Amendment suit against a federal employer, *see Bush v. Lucas*, 462 U.S. 367 (1983); a race discrimination suit against military officers, *see Chappell v. Wallace*, 462 U.S. 296 (1983); a substantive due process suit against military officers, *see United States v. Stanley*, 483 U.S. 669 (1987); a procedural due process suit against Social Security officials, *see Schweiker v. Chilicky*, 487 U.S. 412 (1988); a procedural due process suit against a federal agency for wrongful termination, *see FDIC v. Meyer*, 510 U.S. 471 (1994); an Eighth Amendment suit against a private halfway house operator under contract with the BOP, *see Corr. Servs. Corp. v. Malesko*, 534 U.S. 61 (2001); a claim of retaliation by Bureau of Land Management officials against plaintiff for his exercise of Fifth Amendment property rights, *see Wilkie v. Robbins*, 551 U.S. 537 (2007); a suit under the Fifth, Eighth, and Fourteenth Amendments against United States Public Health Service personnel, *see Hui v. Castaneda*, 559 U.S. 799 (2010); an Eighth Amendment suit

(continued . . .)

Supreme Court has indicated that "if [the Court] were called to decide *Bivens* today, [it] would decline to discover any implied causes of action in the Constitution." *Egbert*, 596 U.S. ___, 142 S. Ct. at 1809 (citation omitted).

In deciding whether a *Bivens* remedy is available, courts first consider whether providing such a remedy is precluded by prior cases in which the Supreme Court or the Ninth Circuit has declined to recognize an implied right of action.  *See Lanuza v. Love*, 899 F.3d 1019, 1025 (9th Cir. 2018).  If a claim is precluded, that is the end of the matter.  If a claim is not precluded, courts then apply a two-step test.

At step one, courts determine whether a plaintiff is seeking a *Bivens* remedy in a new context.  *See Ioane v. Hodges*, 939 F.3d 945, 951 (9th Cir. 2018).  The context is new "[i]f the case is different in a meaningful way from previous *Bivens* cases decided by [the Supreme Court]." *Abbasi*, 582 U.S. at ___, 137 S. Ct. at 1859.  If the plaintiff is seeking a *Bivens* remedy in a new context, then courts proceed to the second step.

---

(. . . continued)
against prison guards at a private prison, *see Minneci v. Pollard*, 565 U.S. 118 (2012); a Fifth Amendment suit against Department of Justice officials, *see Abbasi*, 582 U.S. ___, 137 S. Ct. 1843; a Fourth and Fifth Amendment suit against a United States Border Patrol agent, *see Hernandez v. Mesa*, 589 U.S. ___, 140 S. Ct. 739 (2020); and a First and Fourth Amendment suit against a United States Border Patrol Agent, *see Egbert v. Boule*, 596 U.S. ___, 142 S. Ct. 1793 (2022).

At step two, courts may extend *Bivens* only if two conditions are met.  First, "a court may not fashion a *Bivens* remedy if Congress already has provided, or has authorized the Executive to provide, 'an alternative remedial structure.'"  *Egbert*, 596 U.S. at ___, 142 S. Ct. at 1804 (citations omitted)).  "So long as Congress or the Executive has created a remedial process that it finds sufficient to secure an adequate level of deterrence, the courts cannot second-guess that calibration by superimposing a *Bivens* remedy."  *Id.* at ___, 142 S. Ct. at 1807.  "Second, if a claim arises in a new context, a *Bivens* remedy is unavailable if there are 'special factors' indicating that the Judiciary is at least arguably less equipped than Congress to 'weigh the costs and benefits of allowing a damages action to proceed.'"  *Id.* at ___, 142 S. Ct. at 1803 (citation omitted).  "If there is even a single 'reason to pause before applying *Bivens* in a new context,' a court may not recognize a *Bivens* remedy."  *Id.* (citation omitted).  Although the Supreme Court has yet to define "special factors," it has explained that "the inquiry must concentrate on whether the Judiciary is well suited, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action to proceed."  *Abbasi*, 582 U.S. at ___, 137 S. Ct. at 1857–58.

The Supreme Court has stated that this two-step test often resolves to a single question:  "whether there is *any* rational reason (even one) to think that *Congress* is better suited to 'weigh the costs and benefits of allowing a damages

action to proceed.'" *Egbert*, 596 U.S. at ___, 142 S. Ct. at 1805 (citation omitted). "Put another way, 'the most important question is who should decide whether to provide for a damages remedy, Congress or the courts?'" *Id.* at ___, 142 S. Ct. at 1803 (citation omitted). "If there is a rational reason to think that the answer is 'Congress' — as it will be in most every case, no *Bivens* action may lie." *Id.* (citation omitted). Thus, "if there is any reason to think that 'judicial intrusion' into a given field might be 'harmful' or 'inappropriate,'" or "even if there is the '*potential*' for such consequences, a court cannot afford a plaintiff a *Bivens* remedy." *Id.* at ___, 142 S. Ct. at 1805–06 (citations omitted).

**B.    Eighth Amendment**

The Eighth Amendment governs the treatment of convicted prisoners and forbids "cruel and unusual punishments." U.S. Const. amend. VIII; *see Sandoval v. County of San Diego*, 985 F.3d 657, 667 (9th Cir. 2021). Although the Constitution "'does not mandate comfortable prisons,'" it does not "permit inhumane ones." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (citations omitted). Prison officials, therefore, may not use excessive physical force against prisoners, they "must ensure that inmates receive adequate food, clothing, shelter, and medical care, and [they] must 'take reasonable measures to guarantee the safety of the inmates.'" *Id.* (citations omitted).

1.     **Failure To Protect**

Watanabe alleges in Count I that FDC Honolulu officials violated the Eighth Amendment because they failed to protect him from harm by other inmates.[5]  ECF No. 8 at 6–8.

The Supreme Court has not explicitly held that a *Bivens* remedy is available under the Eighth Amendment for a failure to protect claim.  The Court declines to decide whether Watanabe's failure to protect claims arise in a new context or if "special factors" caution against extending *Bivens* to those claims during screening pursuant to 28 U.S.C. §§ 1915(e)(2) and 1915A, without briefing by the parties upon either a motion to dismiss or for summary judgment.  *See Williams v. Kobayashi*, Civ. No. 1:18-cv-00336 DKW-RLP, 2018 WL 5258614, at *7 (D. Haw. Oct. 22, 2018) (declining to decide during screening whether special factors

---

[5]  At various points, Watanabe alleges that Defendants violated Bureau of Prisons policies.  *See* ECF No. 8 at 6–8.  The Supreme Court has never recognized a *Bivens* cause of action for purported violations of BOP policies.  *See Islaam v. Kubicki*, 838 F. App'x 657, 661 (3d Cir. 2020).  Indeed, as one court has stated, "[t]o allow a damages remedy for violations of BOP policy that do not amount to unconstitutional conduct would exceed the bounds of judicial function." *Id.* (citation omitted); *see also deWilliams v. Groves*, No. ED CV 17-356-GW (PLA), 2019 WL 994407, at *5 (C.D. Cal. Jan. 16, 2019) ("[T]he mere failure of a correctional officer to follow BOP rules, procedures, or policies does not rise to the level of a federal civil rights violation." (citation omitted)); *Williams v. Rios*, No. 1:10-cv-01207-AWI-GBC (PC), 2011 WL 1627177, at *3 (E.D. Cal. Apr. 28, 2011) ("[A] *Bivens* action must be founded upon a violation of constitutional rights, and a failure to adhere to administrative regulations does not equate to a constitutional violation." (internal quotation marks and citations omitted)).

cautioned against extending *Bivens* to substantive due process claims).

Even assuming the existence of a *Bivens* remedy, however, Watanabe fails to state a plausible claim. *See Hernandez*, 582 U.S. at ___, 137 S. Ct. at 2007 ("[D]isposing of a *Bivens* claim by resolving the constitutional question, while assuming the existence of a *Bivens* remedy — is appropriate in many cases."); *Ansari v. Martinez*, 859 F. App'x 842, 842 (9th Cir. 2021) ("The district court properly dismissed [the plaintiff's] Eighth Amendment claims because, even if a *Bivens* remedy is available for these claims, [the plaintiff] failed to allege facts sufficient to state a plausible claim." (citations omitted)).

The Eighth Amendment imposes on prison officials a duty to "take reasonable measures to guarantee the safety of the inmates." *Farmer*, 511 U.S. at 832 (internal quotation marks and citation omitted). Prison officials, therefore, "have a duty to protect prisoners from violence at the hands of other prisoners." *Id.* at 833 (internal quotation marks, alteration, and citation omitted).

A prison official violates the Eighth Amendment, however, only when two requirements are met. "First, the deprivation alleged must be objectively, sufficiently serious." *Id.* at 834 (citations omitted). "For a claim . . . based on a failure to prevent harm, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm." *Id.* (citation and footnote omitted). Second, the plaintiff must show deliberate indifference — that is, that

"the [prison] official kn[ew] of and disregard[ed] an excessive risk to

inmate . . . safety." *Id.* at 837. "[T]he official must both be aware of facts from

which the inference could be drawn that a substantial risk of serious harm exists,

and he must also draw the inference." *Id.*

### a.     Prior To The July 12, 2021 Disturbance

Watanabe has not plausibly alleged that he faced a substantial risk of serious

harm prior to July 12, 2021.  Although prison officials housed in unit 5A various

groups including "members from rival gangs," "deportable aliens," "pre-sentence

inmates," "pre-trial inmates," "high security inmates through minimum security

inmates," and inmates with "pending orders for civil commitment due to

psychiatric issues," ECF No. 8 at 6, Watanabe has not plausibly alleged that there

was a substantial risk of serious harm prior to July 12.  For example, Watanabe

does not allege that there was any gang-on-gang violence in unit 5A prior to July

12.  Nor does he allege that his gang — that is, Uso — had previous issues with the

Paisa's.  Moreover, Watanabe has not plausibly alleged that he was specifically

targeted for harm by Paisa's members because of his "history of

gang . . . affiliation." *Id.*  Indeed, it is unclear if the four attackers were motivated

by Watanabe's gang membership or something else on July 12.

To the extent Watanabe is suggesting that housing members of different

gangs together necessarily amounts to an Eighth Amendment violation, he is

mistaken. *See Labatad v. Corr. Corp. of Am.*, 714 F.3d 1155, 1160 (9th Cir. 2013) ("[A]mong other problems, 'the number of gang members housed and the high representation of certain gangs would place an unmanageable burden on prison administrators were they required to separate inmates by gangs.'" (quoting *Mayoral v. Sheahan*, 245 F.3d 934, 939 (7th Cir. 2001) (alterations omitted)); *Wilson v. Pierce County*, Case No. 16-5455 RJB, 2017 WL 3876625 (W.D. Wash. Sept. 5, 2017) ("The Ninth Circuit has held that a jail's policy of housing rival gang members together does not amount to a per se violation of the Eighth Amendment." (citing *Labatad*, 714 F.3d at 1160)).

Even if prison officials knew both of Watanabe's historical affiliation with the Uso gang and that rival gangs were being housed together in unit 5A, this is not enough to satisfy the first requirement of a failure to protect claim. *See Murphy v. Shelby*, No. C 07-02299 JF (PR), 2009 WL 773499, at *4 (N.D. Cal. Mar. 23, 2009) ("Even assuming that Defendants knew that Plaintiff and [another inmate] were members of rival gangs, this information alone is not sufficient to raise the inference that putting them in the same cell would create a substantial risk of serious harm[.]").

Moreover, Watanabe has not plausibly alleged that any Defendant acted with deliberate indifference to his safety prior to July 12, 2021. Although Watanabe alleges that Warden Derr housed together "rival gang members," pretrial detainees,

14

and convicted inmates, and Robl placed "violent individuals" in the same housing unit and, sometimes, in the same cell, ECF No. 8 at 8, he does not say how any prison official knew of and disregarded an excessive risk to inmate safety. Watanabe does not allege that he complained to any prison official about his placement in unit 5A prior to July 12, nor does he allege that any other inmate voiced concern about gang-on-gang violence prior to the July 12 disturbance.

At one point, Watanabe alleges that Warden Derr and Robl "discussed the issue of housing rival gang members in the same units and cells with staff." *Id.* Watanabe does not say, however, when this discussion allegedly occurred. He also does not say what conclusion Warden Derr and Robl reached at the end of that discussion. In short, Watanabe has not plausibly alleged that Warden Derr and Robl knew of and disregarded an excessive risk to his safety prior to July 12 disturbance.

### b.    After The July 12, 2021 Disturbance

Watanabe appears to assert that his safety is currently threatened because prison officials returned him to unit 5A after he spent two months in the SHU. ECF No. 8 at 7.

Watanabe has not plausibly alleged that he currently faces a substantial risk of serious harm in unit 5A. Watanabe does not allege that the four men who

attacked him on July 12 or anyone else has harmed him since he returned to unit

5A.  Nor does he allege that anyone has attempted or even threatened to harm him.

Watanabe notes that two inmates in unit 5A — one a member of a

"Northeno gang" and the other a member of a "Hawaiian gang" — got into a fight

on March 24, 2022.  *Id.*  This single incident between two inmates, however, falls

short of showing a substantial risk of serious harm to Watanabe.  *See Hudson v.*

*Palmer*, 468 U.S. 517, 526 (1984) ("Prisons, by definition, are places of

involuntary confinement of persons who have a demonstrated proclivity for

antisocial criminal, and often violent, conduct.").  Indeed, nothing suggests that

these two inmates got into a fight because of their respective gang associations.

In addition, Watanabe has not plausibly alleged that a prison official is

acting with deliberate indifference to his safety.  Watanabe does not allege that he

has ever complained to prison officials about his safety in unit 5A.  Thus,

Watanabe has not alleged that any Defendant knows of the purported danger that

he faces.  *See M.G. v. United States*, 603 F. App'x 616, 617 (9th Cir. 2015) ("To

plead deliberate indifference, [the plaintiff] must allege nonconclusory facts from

which we can infer defendants . . . actually knew of the danger [the plaintiff]

faced." (citations omitted)).

Watanabe's failure to protect claims in Count I are therefore DISMISSED

without prejudice.

### 2.      Denial Of Adequate Medical Care

Watanabe alleges in Count II that he was denied adequate medical care following the July 12, 2021 disturbance.  ECF No. 8 at 9.

As already noted, "*Carlson* recognized an implied claim under the Eighth Amendment's cruel and unusual punishment clause for prison officials' failure to provide adequate medical care." *Hoffman v. Preston*, 26 F.4th 1059, 1064 (9th Cir. 2022) (citation omitted).  "To establish a claim of inadequate medical care, a prisoner must first show a 'serious medical need' by demonstrating that failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain." *Edmo v. Corizon, Inc.*, 935 F.3d 757, 785 (9th Cir. 2019) (per curiam) (some internal quotation marks and citation omitted).  "If . . . a prisoner establishes a sufficiently serious medical need, that prisoner must then show the official's response to the need was deliberately indifferent." *Id.* at 786 (internal quotation marks, brackets, and citation omitted). "To show deliberate indifference, the plaintiff must show that the course of treatment the official chose was medically unacceptable under the circumstances and that the official chose this course in conscious disregard of an excessive risk to the plaintiff's health." *Id.* (internal quotation marks, brackets, and citation omitted).  "Deliberate indifference is a 'high legal standard' beyond malpractice or

17

gross negligence." *Balla v. Idaho*, 29 F.4th 1019, 1025–26 (9th Cir. 2022) (citation omitted).

      **a.**    **Nurse Nielsen**

Watanabe alleges that he was "severely beaten" by four members of the Paisa's gang and "other Latino gang members" on July 12, 2021.  ECF No. 8 at 7. During the attack, someone beat Watanabe with a "lock in a sock."  *Id.*  Later that evening, Watanabe was suffering from "severe pain and headaches," and he asked to be seen by medical staff.  *Id.*  Watanabe "discussed his medical condition" with Nurse Nielsen, but Nielsen told him "'to stop being a cry baby.'"  *Id.*  Nielsen also refused to send Watanabe to the hospital.  *Id.*

Months later, Watanabe was diagnosed with a fractured coccyx and "bone chips in soft tissue around his tailbone."  *Id.*  These injuries caused Watanabe "severe pain."  *Id.*  As the Court has already concluded, *see* ECF No. 5 at 17–18, Watanabe's allegations plausibly state a denial of adequate medical care claim against Nielsen in his individual capacity that may proceed.

      **b.**    **Dr. Kwon**

Watanabe also alleges in Count II that Dr. Kwon denied him adequate medical care in the months after the July 12 disturbance.  ECF No. 8 at 9.

According to Watanabe, "[f]rom July through January 2022, [Dr. Kwon] had an opportunity to properly diagnose [Watanabe's] injuries, but failed to do so."  *Id.*

Watanabe alleges that he submitted at least eleven informal complaints to Dr.

Kwon.  *Id.* at 8.

Watanabe does not say, however, when he submitted the informal

complaints to Dr. Kwon or what he said in them.  In addition, although Watanabe

alleges that he "received no actual treatment," *id.* at 7, he acknowledges that he did

receive over-the-counter pain medication.  *Id.*  Watanabe also admits that someone

diagnosed his fractured coccyx and that Health Services agreed to send him to see

a specialist.  *Id.* at 7, 9.  It is unclear if Dr. Kwon played a role in providing this

care.  Thus, Watanabe has not plausibly alleged that Dr. Kwon consciously

disregarded a serious medical need.  *See Lemire v. Cal. Dep't of Corr. & Rehab.*,

726 F.3d 1062, 1081–82 (9th Cir. 2013) ("The indifference to a prisoner's medical

needs must be substantial.  Mere 'indifference,' 'negligence,' or 'medical

malpractice' will not support this claim." (quoting *Broughton v. Cutter Labs.*, 622

F.2d 458, 460 (9th Cir. 1980)) (brackets and some internal quotation marks

omitted).  Watanabe's denial of adequate medical care claims against Dr. Kwon

are therefore DISMISSED without prejudice.

## IV.   CONCLUSION

(1)  Watanabe states a denial of adequate medical care claim in Count II

against Nielsen in his individual capacity that may proceed.

(2)  Watanabe's failure to protect claims in Count I and his other denial of adequate medical care claim in Count II are DISMISSED without prejudice. Dismissal of these claims does not foreclose Watanabe from later filing an amended pleading, subject to the requirements of Federal Rule of Civil Procedure 15 and any applicable orders of this Court.

(3)  The United States Marshal is ORDERED to serve the FAC, ECF No. 8, and a summons on Defendant Francis Nielsen, in addition to the United States, as directed by Watanabe, according to the requirements of Federal Rule of Civil Procedure 4(i).  After service is perfected, Defendant Nielsen shall file a responsive pleading within the time allowed under Fed. R. Civ. P. 12.

## V.  <u>SERVICE ORDER</u>

IT IS HEREBY ORDERED:

(1)  For Defendant Francis Nielsen, the Clerk is directed to send to Plaintiff: one copy of the FAC, ECF No. 8; one completed summons; one USM-285 form; one Notice of Lawsuit and Request for Waiver of Service of Summons form (AO 398); two Waiver of Service of Summons forms (AO 399); and an instruction sheet.

(2)  For the United States, *see* Fed. R. Civ. P. 4(i)(3), the Clerk is directed to send to Plaintiff two additional copies of the FAC, ECF No. 8; two completed summonses; and two USM-285 forms.

20

(3)  The Clerk shall also send a copy of this Order to the U.S. Marshal at P.O. Box 50184, Honolulu, HI 96850.

(4)  For Defendant Nielsen, Plaintiff shall complete the forms as directed and submit the following documents to the U.S. Marshal in Honolulu, Hawaiʻi:  a completed USM-285 form; a copy of the FAC, ECF No. 8; the completed summons; a completed Notice of Lawsuit and Request for Waiver of Service of Summons form (AO 398); and two completed Waiver of Service of Summons forms (AO 399).  For the United States, Plaintiff shall complete the forms as directed and submit to the U.S. Marshal: two completed USM-285 forms; two copies each of the FAC, ECF No. 8; and the two completed summonses.

(5)  Upon receipt of these documents from Plaintiff, the U.S. Marshal shall mail to Defendant Nielsen:  a copy of the FAC, ECF No. 8; a completed Notice of Lawsuit and Request for Waiver of Service form (AO 398); and two completed Waiver of Service of Summons forms (AO 399), as directed by Plaintiff without payment of costs.  *See* Fed. R. Civ. P. 4(c)(3).  The U.S. Marshal shall deliver a copy of the completed summons, the FAC, ECF No. 8, to the United States Attorney for the District of Hawaii and the Attorney General of the United States as directed by Plaintiff without payment of costs.

(6)  For Defendant Nielsen, the U.S. Marshal shall retain the completed summons and a copy of the FAC, ECF No. 8.  The U.S. Marshal shall file a

returned Waiver of Service of Summons form as well as any Waiver of Service of Summons form that is returned as undeliverable, as soon as it is received.

(7)  If Defendant Nielsen does not return a Waiver of Service of Summons form within sixty days from the date that such forms are mailed, the U.S. Marshal shall:

a.  Personally serve such Defendant pursuant to Federal Rule of Civil Procedure 4 and 28 U.S.C. § 566(c).

b.  Within ten days after personal service is effected, file the return of service for such Defendant, along with evidence of any attempts to secure a waiver of service of summons and of the costs subsequently incurred in effecting service. Said costs shall be enumerated on the USM-285 form and shall include the costs incurred by the U.S. Marshal's office in photocopying additional copies of the summons, the FAC, and for preparing new USM-285 forms, if required.  Costs of service will be taxed against the personally served Defendant in accordance with the provisions of Federal Rule of Civil Procedure 4(d)(2).

(8)  Plaintiff is cautioned that if he fails to comply with this Order and his non-compliance prevents timely and proper service as set forth in Federal Rule of Civil Procedure 4(m), this action is subject to dismissal for failure to serve.

(9)  Defendant Nielsen shall file a responsive pleading to the FAC, ECF No. 8, within the time set forth in Federal Rule of Civil Procedure 12.

(10)  Plaintiff shall inform the Court of any change of address by filing a

"NOTICE OF CHANGE OF ADDRESS."  The notice shall contain only

information about the change of address and its effective date and shall not include

requests for other relief.  Failure to file such notice may result in the dismissal of

the action for failure to prosecute under Fed. R. Civ. P. 41(b).

(11)  After the FAC, ECF No. 8, is served and Defendant Nielsen has filed

an answer or responsive pleading, Plaintiff's documents are deemed served when

they are electronically filed by the court.  The United States Marshal is not

responsible for serving these documents on Plaintiff's behalf.

(12)  Until the FAC, ECF No. 8, is served and Defendant Nielsen or his

attorneys file a notice of appearance, Plaintiff SHALL NOT FILE MOTIONS OR

OTHER DOCUMENTS with the Court.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaiʻi, August 2, 2022.



Jill A. Otake
United States District Judge

*Watanabe v. Derr, et al.*, Civil No. 22-00168 JAO-RT; ORDER DISMISSING FIRST AMENDED COMPLAINT
IN PART AND DIRECTING SERVICE